## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE REPUBLIC OF ARTSAKH**, on behalf of its civilian population (*28 Azatamartikneri Ave., Stepanakert, Artsakh*); <br><br> **NVER LALAYAN**, as survivor and next-of-kin of Arkady Lalayan, (*Alek Manukyan Street, Yerevan, Armenia*); <br><br> **SERGEY KOSTANDYAN**, (*12 Bryusov St., Stepanakert, Artsakh*); <br><br> and <br><br> **ELMIRA TOROSYAN**, (*Shosh Village, Askeran District, Artsakh*), <br><br>       Plaintiffs, <br><br> v. <br><br> **L3HARRIS TECHNOLOGIES, INC.** (*1025 W. NASA Blvd, Melbourne, FL 32119*), <br><br>       Defendant. | No. 1:20-cv-2987 <br><br> Judge _____ |

## COMPLAINT

Now Come Plaintiffs, THE REPUBLIC OF ARTSAKH (also known as Nagorno Karabakh), on behalf of its civilian population, as well as NVER LALAYAN (as survivor and next-of-kin of Arkady Lalayan), SERGEY KOSTANDYAN, and ELMIRA TOROSYAN, and file this COMPLAINT against Defendant L3HARRIS TECHNOLOGIES, INC., and, in support thereof, state as follows:

1

## NATURE OF THE CASE

1.     Defendant designed, engineered, manufactured, sold, and supported certain electro-optical/infra-red sensors ("EO/IR Targeting Sensors") used by the Republic of Turkey ("Turkey") and the Republic of Azerbaijan ("Azerbaijan") to target, hunt, attack, and kill civilians in Artsakh.

2.     Defendant aided and abetted Turkey and Azerbaijan in the commission of torture, extrajudicial killings, war crimes, crimes against humanity, and genocide. Defendant's EO/IR Targeting Sensors equipped Turkey and Azerbaijan's intelligence-striking unmanned aerial vehicles ("UAVs" or "drones") with sophisticated means by which to target, hunt, attack, and kill civilians and to destroy civilian property and civilian infrastructure.

3.     Plaintiffs are either the legal representatives of certain victims killed in such attacks or they are severely injured victims of such attacks. Plaintiffs seek monetary damages for the loss of human life and civilian property resulting from the use of Defendant's EO/IR Targeting Sensors and punitive damages for Defendant's role in aiding and abetting gross violations of the law of nations by Turkey and Azerbaijan, including torture, extrajudicial killings, war crimes, crimes against humanity, and genocide.

## PARTIES

4.     Plaintiff REPUBLIC OF ARTSAKH is a sovereign state in the Caucasus region populated by approximately 150,000 ethnic Armenians. Its capital is Stepanakert. Plaintiff is authorized to represent the civilians residing in Artsakh, collectively, in matters of foreign affairs and dispute, to protect their human rights.

5.     Plaintiff NVER LALAYAN is the survivor and next-of-kin of Arkady Lalayan, a civilian living in Artsakh who was killed by joint Turkish and Azerbaijani airstrikes on the civilian

population of Artsakh carried out by UAVs equipped with EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant.

6.     Plaintiff SERGEY KOSTANDYAN is a civilian living in Artsakh who was severely wounded by joint Turkish and Azerbaijani airstrikes on the civilian population of Artsakh carried out by UAVs equipped with EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant.

7.     Plaintiff ELMIRA TOROSYAN is a civilian living in Artsakh who was severely wounded by joint Turkish and Azerbaijani airstrikes on the civilian population of Artsakh carried out by UAVs equipped with EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant.

8.     Defendant L3HARRIS TECHNOLOGIES, INC. is a Delaware corporation with its corporate headquarters in Melbourne, Florida and does business within the jurisdiction District of Columbia. L3HARRIS TECHNOLOGIES, INC. is the parent company of L3Harris Technologies, Inc. Canada Group, Inc.

9.     Defendant is a sophisticated multibillion-dollar corporation and one of the largest defense contractors in the world, specializing in surveillance solutions, microwave weaponry, and electronic warfare.

10.     Defendant operates through subsidiary corporations, one of them being L3Harris Technologies Canada Group, Inc., which is a Canadian corporation with its registered office in Burlington, Ontario. Upon information and belief, L3Harris Technologies Canada Group, Inc. operates under the assumed names "L3Harris Wescam" and "L3Harris MAS".

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 because the action arises under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS") as a claim brought by aliens in tort only, committed in violation of the Geneva Conventions of 1949 and their Additional Protocols, the law of nations, and the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73.

12.     Plaintiffs are not citizens or residents of the United States.

13.     Venue is proper in the District Court for the District of Columbia for this action pursuant to 28 U.S.C. § 1391(b) because, among other things, Defendant continuously and regularly conducts its established business and business related activity in the District of Columbia, where it maintains an office at 600 Maryland Avenue SW, Washington, D.C.

## FACTS COMMON TO ALL COUNTS

14.     Artsakh is a small state populated by ethnic Armenians that declared its independence in 1991. It is located between the Republic of Armenia ("Armenia") and Azerbaijan in the South Caucasus. Armenia and Artsakh (whose populations together total around 3 million) are sandwiched between Turkey and Azerbaijan (whose populations together total nearly 100 million).

15.     Since on or around 2017, Defendant has designed, engineered, manufactured, sold, and supported EO/IR Targeting Systems for Turkey's UAVs.

16.     In or around February 2020, Turkey and Azerbaijan signed a deal for the purchase of defense products, including UAVs with EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant.

17.     Since in or around as recently as June 2020, Turkey sold to Azerbaijan UAVs with EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant. According to military analysts, Azerbaijan aimed to use the Turkish UAVs to win military leverage on neighboring Armenia. Such UAVs spearhead Azerbaijan's attack on the civilian population in Artsakh.

18.     On or about September 27, 2020, Azerbaijan unleashed a large-scale military attack along the entire line of contact between Azerbaijan and Artsakh.

19.     In the weeks preceding the attack, the Azerbaijani President had repeated bellicose claims that he would settle the Azerbaijani-Artsakh matter by military means.

20.     Azerbaijan's President openly dismissed the efforts of mediators, despite the fact that the Helsinki Additional Meeting of the CSCE Council on March 24, 1992 established the Organization for Security and Co-operation in Europe ("OSCE") Minsk Group (led by co-chairs United States, France, and Russia) as the mediation mechanism to provide a peaceful resolution to the conflict.

21.     Turkish President Recep Tayyip Erdogan likewise dismissed the mediation efforts of the OSCE Minsk Group co-chairs, even though Turkey itself is a member of the OSCE Minsk Group.

22.     Reports indicate that, at the time of Azerbaijan's attacks against Artsakh, an estimated 150 high-ranking Turkish military officials were stationed in Azerbaijan command centers while released intelligence data shows that the Turkish Air Force was directly involved in those attacks. Turkey and Azerbaijan had held joint military drills in Azerbaijan in July 2020.

*Canada's Halt on Defendant's Military Exports to Turkey*

23.     In September 2020, the Canadian Foreign Ministry acknowledged a report ("Ploughshares Report") examining "collected evidence in government and public records, media reports, academic sources, accounts from credible human-rights monitors, and open-source data that strongly indicates that WESCAM EO/IR sensors, mounted on unmanned aerial vehicles (UAVs), have been used extensively by Turkey in its recent military activities."[1]

24.     The Ploughshares Report also provided that, "[b]ased on an analysis of Canada's international obligations, domestic arms controls, and an evaluation of Turkey's recent conduct during warfare, Canada's export of WESCAM sensors to Turkey poses a substantial risk of facilitating human suffering, including violations of human rights and international humanitarian law. Canadian officials are obligated by international and Canadian law to mitigate the risks of such transfers, including through the denial of export permits, when such risks are apparent from the outset—which appears to be the case with WESCAM exports to Turkey."[2]

25.     On October 5, 2020, the Canadian Foreign Affairs Ministry halted all military export permits to Turkey after an investigation into claims that Turkey was using Canadian technology to attack the Armenian civilian population.

26.     Despite Canada's ban on military exports to Turkey for humanitarian reasons, which directly impacted Defendant's subsidiary corporation in Canada, and upon information and belief, Defendant continues to design, engineer, manufacture, sell, and/or support EO/IR Targeting Sensors for UAVs used by Turkey and Azerbaijan to target civilians in Artsakh.

---

[1] Ploughshares Special Report, Killer Optics, at 7, available at https://ploughshares.ca/wp-content/uploads/2020/09/TurkeyWESCAMReportSept.2020.pdf, accessed October 15, 2020.
[2] *Id*. at Overview.

*The UAVs Employed By Azerbaijan and Turkey in Artsakh*

27.     A report published by the Human Rights Ombudsman of the Republic of Armenia specifically identified certain UAVs used by Azerbaijan on the Artsakh civilian population. The report identified the following UAVs: Orbiter–2, Orbiter–3, Aerostat, among others; striking drones, including Harop, Zaoba-1K, Sky Striker; and intelligence-striking drones, Bayraktar TB-2 and AN-2.

28.     The intelligence-striking drone, Bayraktar TB-2, is the "flagship" of the Turkish armed forces' fleet of UAVs, and Turkey currently has an estimated 94 Bayraktar TB-2s. In 2019, Turkey began exporting the Bayraktar TB-2s.

29.     Defendant designed, engineered, manufactured, sold, and supported the EO/IR Targeting Sensors used in the Bayraktar TB-2s.

30.     EO/IR sensors are cameras that capture images across varying spectrums of light. EO/IR sensors are commonly fixed to vehicles and relay a live video feed to an operator.

31.     The TB2 comes in both surveillance and armed variants, with the armed variant being Turkey's primary combat UAV. Turkey's primary combat UAVs rely ***exclusively*** on Defendant's EO/IR Targeting Sensors.

32.     Specifically, the Bayraktar TB-2 uses Defendant's WESCAM EO/IR system identified as MX-15D.

33.     The MX-15 is 419 millimeters (mm) wide and 495 mm high, weighing approximately 48.7 kilograms (kg). Each unit is modular and can be configured to meet the needs of the buyer. The sensor offers a suite of functionalities, including full day-and-night vision capability, haze penetration, infrared imaging, and high magnification-zoom.

34.     A close-up of the MX-15D is shown below:



*Figure 1*

35.     The MX-15D model, which possesses all base functionality, includes a laser designator, the critical component that directs smart munitions to targets.

36.     These munitions, such as laser-guided bombs or precision missiles, are either launched from a UAV equipped with the WESCAM MX-15D system or from other platforms working in tandem, such as Turkey's F-16 Fighting Falcon.

37.     The system is mounted on the front underbelly of the Bayraktar TB-2, as illustrated in the figure below:



*Figure 2*

38.     Footage of missile strikes by the Azerbaijani military posted on the internet contains a graphical overlay on the video that bears a very strong resemblance to the proprietary graphical overlays of systems manufactured by Defendant.

39.     Similarly, photographs obtained during a fact-finding mission by the Human Rights Defender of the Republic of Armenia specifically identify the deployment by Azerbaijan and Turkey of the Bayraktar TB-2 in its war against the civilian population of Artsakh.[3] The Bayraktar TB-2 uses EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant.

*Civilians in Artsakh Targeted by Defendant's UAVs*

40.     The use of Turkish UAVs in airstrikes against civilian targets is consistent with a publicly documented and clear course of conduct by Turkey. In 2019, Amnesty International reported that "a Turkish airstrike on a market struck a civilian convoy that included several journalists" in Syria.[4] Airwars reported a Turkish drone attack directly targeting a family in June 2020, which killed 12-20 civilians. In July 2020, a Turkish drone struck a grocery store in Iraq wounding the owners and their two small children.

41.     In the days following the initial attacks on Artsakh's civilian population, Azerbaijan and Turkey began direct attacks on more than 120 civilian settlements in Artsakh using Defendant's EO/IR Targeting Sensors, incessantly pounding residential areas with heavy artillery and targeted strikes as well as through the use of internationally-banned cluster munitions.[5] These

---

[3] The Human Rights Defender of the Republic of Armenia, Ad Hoc Report on Azerbaijani Drones' Targeted Attacks Against Peaceful Population of Armenia and Artsakh in Grave Breach of International Law, October 5, 2020, https://ombuds.am/images/files/de3634c257bb698735db318a33f280bf.pdf?fbclid=IwAR2oI0wXo2GceMWmobdq mFZxNB5wf7yBt_saz3twPbo6bae3MnIOqBHUaPk, accessed October 15, 2020.

[4] "Syria: Damning evidence of war crimes and other violations by Turkish forces and their allies", Amnesty International, October 18, 2019, https://www.amnesty.org/en/latest/news/2019/10/syria-damning-evidence-of-war-crimes-and-other-violations-by-turkish-forces-and-their-allies/, accessed October 15, 2020.

[5] "Armenia/Azerbaijan: Civilians must be protected from use of banned cluster bombs", Amnesty International, October 5, 2020,

direct attacks on civilian populations, residential areas, schools, hospitals, and churches have continued unabated and, in fact, have increased and continue to intensify, resulting in death, severe injury, civilian destruction, and outright terror.

42.     Even after the announcement of a 72-hour humanitarian ceasefire on October 10, 2020, Azerbaijan launched an offensive within the hour, again targeting and killing civilians using Defendant's EO/IR Targeting Sensors.

43.     In addition to the military of Azerbaijan and Turkey attacking civilians in Artsakh, Turkey has transported more than 1,000 Syrian jihadists and mercenaries to fight against Armenians. France, Russia, and Uruguay have openly accused Turkey of transporting Syrian jihadists and mercenaries to Artsakh.

44.     Turkey and Azerbaijan's targeting of civilian populations, and even international journalists, using UAVs equipped with Defendant's EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant, has been especially heinous in the most heavily-populated capital city of Stepanakert, Artsakh.

45.     Children and women in Artsakh are sheltering in basements to escape violence or have otherwise been displaced from their homes due to the constant shelling, the threat of drone strikes, and the destruction of homes. Heavy casualties are being reported in Stepanakert, which has been left for long periods without electricity and communications.

46.     On October 1, 2020, Azerbaijan's bombardment using UAVs equipped with EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant, injured four journalists reporting on the war. Several other journalists, including an *Agence France-Presse*

---

https://www.amnesty.org/en/latest/news/2020/10/armenia-azerbaijan-civilians-must-be-protected-from-use-of-banned-cluster-bombs/, accessed October 15, 2020. ("Amnesty International's Crisis Response experts were able to trace the location of the footage to residential areas of Stepanakert, and identified Israeli-made M095 DPICM cluster munitions that appear to have been fired by Azerbaijani forces.")

crew and a deputy editor-in-chief sent by the independent Russian TV channel *Dozhd*, narrowly escaped being hit by the shelling. All of the journalists and their vehicles were clearly identified and bore the word "PRESS".

47.      In fact, Turkey and Azerbaijan fired two missiles from UAVs equipped with EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant at an ancient church called the Mother Cathedral of the Holy Savior Ghazanchetsots ("Shushi Cathedral") in the city of Shushi, Artsakh—while children, women and the elderly sheltered in the basement of the Shushi Cathedral at the time of both strikes.

48.      Turkey and Azerbaijan employed a "double tap" strike against the Shushi Cathedral – a tactic of striking both missiles in short temporal proximity, designed to injure first responders and medical personnel and to prevent the rescue of injured civilians. Defendant's EO/IR Targeting Sensors on Turkey and Azerbaijan's UAVs also targeted and injured foreign and local journalists who had arrived at the church to report on the first of the two missile strikes. One of the journalists sustained critical injuries and was hospitalized as a result.

49.      Azerbaijan and Turkey have conducted civilian attacks using heavy artillery shelling and UAVs equipped with EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant. They also have used such UAVs to identify civilian targets and infrastructure, to hunt and kill civilians and to impose a state of terror in Artsakh among the civilian population.

50.      In paragraphs 51-56 Plaintiffs bring to the court's attention the international outrage relevant to this case; in paragraphs 57-79, Plaintiffs bring to the court's attention the policy of ethnic cleansing and genocide perpetrated by Turkey and Azerbaijan; in paragraphs 80-85, Plaintiffs bring to the Court's attention the universal condemnation in the law of nations relating

to these attacks. Notwithstanding international condemnation of civilian targeting and ethnic cleansing, Turkey and Azerbaijan continue to kill Armenian civilians using the EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant.

*International Outrage*

51.     On September 27, 2020, the Organization of American States ("OAS") called upon "Azerbaijan to immediately cease hostilities, especially those directed towards civilians. As we have mentioned before, the practice of attacking civilians as military targets must be banished and constitutes a complete violation of most basic rules governing armed conflict."[6] The OAS further called "on foreign powers to abstain from intervening in the armed conflict with the purpose of escalating the crisis."[7]

52.     On September 27, 2020, the Ministry of Foreign Affairs of Cyprus issued condemnation for "the breach of the ceasefire by Azerbaijan, that has led to intense fighting and resulted in casualties also amongst the civilian population."[8]

53.     On September 29, 2020, the European Court of Human Rights ("ECtHR") applied Rule 39 of the Rules of Court in granting interim measures in *Armenia v. Azerbaijan* for the reason that "the current situation gives rise to a risk of serious violations of the Convention."[9] On October

---

[6] Press Release, Organization of American States, Declaration of the Secretary General of the OAS, Luis Almagro, regarding recent military attacks of Azerbaijan in Nagorno Karabakh (Sep. 27, 2020).
[7] *Id.*
[8] Cyprus Ministry of Foreign Affairs, "Statement by the Ministry of Foreign Affairs on the situation in Nagorno Karabakh", September 27, 2020, https://www.pio.gov.cy/en/press-releases-article.html?id=15921#flat, accessed October 15, 2020.
[9] *Armenia v. Azerbaijan*, Court's decision on the request for interim measure lodged by Armenia against Azerbaijan (29 September 2020), available at https://hudoc.echr.coe.int/eng-press#{%22itemid%22:[%22003-6809725-9108584%22]}, accessed October 15,  2020.

6, the Court also applied Rule 39 interim measures in the case against Turkey, *Armenia v. Turkey*, and subsequently rejected Turkey's request for reconsideration of its decision.[10]

54.     On October 5, 2020, upon reports of continued civilian shelling by Azerbaijan and Turkey using UAVs with EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant and their use of terrorist mercenaries, French President Emmanuel Macron stated that "[a] red line has been crossed, which is unacceptable. I urge all NATO partners to face up to the behaviour of a NATO member. France's response is to ask Turkey for an explanation on this point."[11]

55.     On October 5, 2020, the Amnesty International Crisis Group reported that "Over the weekend, footage consistent with the use of cluster munitions in the city of Stepanakert, was published by the region's de facto authorities, who also reported an unidentified number of civilian casualties after further shelling Stepanakert and Shushi.[12]

56.     Despite these public condemnations and determinations, and upon information and belief, Defendant, as one of the top defense contractors in the world, continues to design, engineer, manufacture, sell, and/or support EO/IR Targeting Sensors used by Turkey and Azerbaijan to target civilians in Artsakh.

---

[10] *Armenia v. Turkey*, Court's decision on the request for an interim measure lodged by Armenia against Turkey (6 October 2020), available at http://hudoc.echr.coe.int/eng-press?i=003-6816855-9120472, accessed October 15, 2020.; *Armenia v. Turkey*, Court's decision on Turkish authorities' request to lift interim measure indicated in the case of Armenia v. Turkey (October 14, 2020), available at http://hudoc.echr.coe.int/eng-press?i=003-6825174-9134722, accessed October 15, 2020.

[11] "Macron reprimands Turkey, accuses Erdogan of sending 'jihadists' to Azerbaijan", France24, October 5, 2020, https://www.france24.com/en/20201002-macron-reprimands-turkey-accusing-erdogan-of-sending-jihadists-to-azerbaijan, accessed October 15, 2020 ("These fighters are known, tracked and identified," Macron alleged, adding that he would call Turkey's President Recep Tayyip Erdogan "in the coming days.").

[12] "Armenia/Azerbaijan: Civilians must be protected from use of banned cluster bombs", Amnesty International, October 5, 2020, https://www.amnesty.org/en/latest/news/2020/10/armenia-azerbaijan-civilians-must-be-protected-from-use-of-banned-cluster-bombs/, accessed October 15, 2020.

*Policy of Ethnic Cleansing and Genocide*

57.     Turkey and Azerbaijan have publicly maintained a course of conduct directed at the extermination and destruction of the Armenian people of Artsakh.

58.     Armenian Prime Minister Nikol Pashinyan announced on October 3, 2020:

> We are facing a fateful chapter in our history. The objective the Azerbaijani-Turkish bandits pursue is not to resolve a military or a military-political task. They are not here to deal with Karabakh or the Karabakh issue. They have not come with the objective of capturing territories, villages, cities. Their key target is the Armenian nation. Their objective is to carry on with their genocidal policy. And they have set themselves the task of bringing to completion the Armenian Genocide.

59.     The Armenian Genocide was perpetrated by Ottoman Turkey against its Armenian population resulting in the killings of 1.5 million Armenians from 1915-1922. Over 30 countries have acknowledged the acts as genocide.

60.     In 1951, the United States "officially recognized the Armenian Genocide, through the United States Government's May 28, 1951, written statement to the International Court of Justice regarding the Convention on the Prevention and Punishment of the Crime of Genocide. It did so again through President Ronald Reagan's Proclamation No. 4838 on April 22, 1981; by House Joint Resolution 148, adopted on April 8, 1975; and by House Joint Resolution 247, adopted on September 10, 1984".[13] Again, between 1984-1988, the United States Congress, acknowledged the killings of 1.5 million Armenians as genocide in hearings and debates leading up to the ratification of the United Nations Genocide Convention.[14] The United States Congress recently

---

[13] The United States Congress, in both the House of Representatives and the Senate passed resolutions officially recognizing the 1915-1923 Armenian Genocide, as perpetrated by the Ottoman Empire and reciting the official recognition in 1951 in S.Res.150 — 116th Congress (2019-2020) and H.Res.296 — 116th Congress (2019-2020).

[14] Stanley Goldman, *Is it Nobody's Business but the Turks?: Recognizing Genocide*, 16 Touro Int'l L. Rev. 25 (2013), pp. 10-12 ("During Congressional hearings and debates, various legislators and other speakers not only discussed the Holocaust of the Jews and the massacre of the Armenians, they actually referred to the slaughter of the Armenians as "genocide.' In fact, there seems to have been no dispute, among the committee members, as to whether the World War I atrocities against the Armenians had qualified as a genocide. All those who spoke on the point identified it as

acknowledged the Armenian Genocide again in 2019, through the passage of House and Senate Resolutions declaring the Turkish campaign of killing 1.5 million Armenians as a "genocide".[15]

61.     This genocidal policy is not limited to Ottoman Turkey. It has continued, publicly and with impunity, through the creation of the Republic of Turkey until the present day. The founder of the Republic, Kemal Ataturk, explained in no uncertain terms in 1923:

> Armenians have no rights at all in this prosperous country. The land is yours, the land belongs to Turks. In history this land was Turkish, therefore is Turkish and will remain Turkish forever. The land has finally been returned to its rightful owners. The Armenians and the others have no rights here at all. These blessed regions are the native lands of the true Turks.[16]

62.     Today's Turkey amplifies such intents in statements from its highest office where, during a coronavirus briefing on May 4, 2020, Turkish President Erdogan publicly used the phrase "the leftovers of the sword" when referring to survivors of the Armenian Genocide.

63.     Turkey's intention towards Armenians has also been acknowledged by the ECtHR in a 2010 holding stating that Turkey failed to protect the life of the murdered Turkish-Armenian journalist Hrant Dink. Mr. Dink was accused of denigrating "Turkishness" because of his writings about recognition of the Armenian Genocide. The court took the view that the Turkish security forces could reasonably be considered to have been aware of the intense hostility towards Hrant Dink in nationalist circles and none of the three authorities informed took any preventative action.

64.     Azerbaijan shares Turkey's shared agenda of genocide and ethnic cleansing of the Armenian population, and it is publicly documented and clear. In 2015 at a joint press statement, with both the presidents of Turkey and Azerbaijan, President Erdogan recited the words of Turkey's founder, Ataturk, who said that "Azerbaijan's joy is ours, Azerbaijan's grief is ours too",

---

such and accepted that the massacre of the Armenians was a classic example of genocide and central to both the Senate and House of Representatives discussion").

[15] S.Res.150 — 116th Congress (2019-2020) and H.Res.296 — 116th Congress (2019-2020).

[16] Marc David Baer, *The Donme; Jewish Converts, Muslim Revolutionaries, and Secular Turks* (Palo Alto: Stanford University Press, 2010), p. 188.

and those of former Azerbaijani President Heydar Aliyev who described the relationship between Turkey and Azerbaijan as "one nation, two states".

65.     Statements by the Azerbaijani leadership have echoed the calls of genocide in Azerbaijan. President Aliyev of Azerbaijan has previously stated "If the Armenian fascist state does not give up its dirty deeds, ***the very existence of the Armenian state can be called into question.***" (Emphasis added.)

66.     The following year, he reiterated this sentiment when speaking of the Artsakh conflict: "If you do not want to die, then get out of Azerbaijani lands."[17]

67.     Testimony from a U.S. congressional hearing revealed that, in 2005, the mayor of Baku, Hajibala Abutalybov, during a meeting with a municipal delegation from Germany, stated: "***Our goal is the complete elimination of Armenians***. You, Nazis, already eliminated the Jews in the 1930s and 40s, right? You should be able to understand us.''[18] (Emphasis added.)

68.     The United States State Department has reported that "civil society activists stated that an entire generation [in Azerbaijan] had grown up listening to hate speech against Armenians."[19]

69.     Armenophobia has been propagated for years by and through Azerbaijan's government. Notably, the Azerbaijani regime has injected Armenophobia into the education of children, spreading hate to generations of Azerbaijanis. An Azerbaijani human rights defender

---

[17] "Ilham Aliyev chaired the meeting of the Cabinet of Ministers dedicated to the results of socioeconomic development in the first quarter of 2015 and objectives for the future", President of Azerbaijan, April 10, 2015, https://en.president.az/articles/14805, accessed October 15, 2020.

[18] The Caucasus: Frozen Conflicts and Closed Borders: Hearing before the Committee on Foreign Affairs House of Representatives, 110th Cong. 50 (2008) (testimony of Congressman Joseph Knollenberg), available at https://web.archive.org/web/20100203152538/http://www.internationalrelations.house.gov/110/43066.pdf, accessed October 15, 2020.

[19] U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, 2019 Country Reports on Human Rights Practices: Azerbaijan, March 11, 2020, Section 6, https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/azerbaijan/, accessed October 15, 2020.

stated that "[s]ince they are 10 years old, the children are made to believe that the Azerbaijanis' enemies are the Christians and the Armenians are called 'faithless people in black garments.'"

70.     When the Azerbaijani military officer, Ramil Safarov, was convicted by a Hungarian court for beheading an Armenian with an ax while the Armenian was asleep in a NATO Peace Program dormitory, Azerbaijan sought to extradite him, claiming that he would serve the rest of the sentence in Azerbaijan. Once in Baku, the Azerbaijani government instead granted Safarov a promotion to a higher military rank, salary arrears for time spent in a Hungarian prison, a flat, and his freedom—and did so in a public ceremony.[20]

71.     As a result, the ECtHR in July 2020 found Azerbaijan in violation of the European Convention's Article 14 (Prohibition against discrimination), finding that "the various measures leading to [the pardoned murderer]'s virtual impunity, coupled with the glorification of his extremely cruel hate crime, had a causal link to the Armenian ethnicity of his victims."

72.     The Azerbaijani government had even created a "special page on the website of the President of Azerbaijan . . . labelled 'Letters of Appreciation regarding [the pardoned murderer]', where individuals could express their congratulations on his release and pardon."

73.     The ECtHR enumerated dozens of statements from Azerbaijani officials and public figures regarding Safarov on the President of Azerbaijan's website. The Commissioner of Human Rights of Azerbaijan, Elmira Suleymanova, delivered the following praise of the ax murderer: "R.S. should become an exemplary model of patriotism for the Azerbaijani youth."

74.     The head of the Centre for Strategic Research Under the President of Azerbaijan wrote about Safarov: "as a true officer, he punished – *in a truly Turkish way*, the man who insulted the flag of the independent Azerbaijan." (Emphasis added.) A member of the Azerbaijani

---

[20] *Makuchyan and Minasyan v. Azerbaijan and Hungary*, no. 17247/13, § 21, May 26, 2020, available at https://hudoc.echr.coe.int/eng#{%22itemid%22:[%22001-202524%22]}, accessed October 15, 2020.

Parliamentary Commission added that "R.S.' release strengthened the authority of the nation. R.S.

[ ] is [ ] the representative of Azerbaijani people . . . this event may enhance the national spirit . . .

R.S. will fight against the Armenians at the Karabakh front."

75. Azerbaijani Minister of Parliament, Elman Mammadov, stated:

Why does Turkey still tolerate the Armenians on its land? For what reason does it hold them? Turkey could rather be a country without Armenians. [...] ***Turkey and Azerbaijan could together wipe Armenia off the face of the Earth at a blow, and the Armenians should beware of that thought***. [...] Why does Turkey create favourable conditions for the Armenians" enrichment? Turkey, exile them at last from your territory, and let them draw conclusions from that!

76. Azerbaijan's Modern Musafat party leader, Hafz Hajiyev, followed suit:

We will assign our sons in Armenia to blow up the nuclear power plant (ANPP) there. There will be no Armenian left there then. Our neighbours can also blame us but ***we have to annihilate all the Armenians*** [...] if the Armenians do not want to live subordinating to the Azerbaijanis, they will be expelled from Karabakh [...] There should be no Armenian left in Azerbaijan.

77. Former Azerbaijan MP, Anar Mammadkhanov, stated in 2014: "I always tell our

officers studying military science in Turkey, 'You are needed in Karabakh. ***They [the Armenians]***

***should be killed in Karabakh*** rather than in other countries.'" (Emphasis added).

78. In 2016, Azerbaijan launched a full-scale, pre-planned and unprecedented attack

along the entire line of contact with Nagorno-Karabakh. Within one week, the United Nations

Committee on the Elimination of Racial Discrimination noted, in its concluding observations on

the periodic report of Azerbaijan, its concern regarding "repeated and unpunished use of

inflammatory language by politicians speaking about the Nagorno-Karabakh conflict and [] its

adverse impact on the public's view of ethnic Armenians[,]" adding that Azerbaijan "condones

racial hatred and hate crimes and denies redress to victims.[21] The United Nations' Human Rights Committee also expressed concern, in that same year, about "allegations of harassment of and discrimination [by Azerbaijan] against members of the Armenian minority."[22]

79.     Today, Turkey and Azerbaijan utilize modern arms to complete their century-long goal of ethnically cleansing Armenians from the region, by systematically and unrelentingly targeting the civilian population of Artsakh, using UAVs equipped with EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant.

### Universal Condemnation of War Crimes

80.     The international community has universally condemned war crimes, thus incorporating this offense into the law of nations.

81.     The following international conventions and/or United Nations Security Council Resolutions support the premise that acts constituting war crimes are incorporated into the law of nations:

> A.     Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, 75 U.N.T.S. 31 ("Geneva Convention I"), (entered into force Oct. 21, 1950);

> B.     Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, 75 U.N.T.S. 85 ("Geneva Convention II"), (entered into force Oct. 21, 1950);

> C.     Convention Relative to the Treatment of Prisoners of War, 75 U.N.T.S. 135 ("Geneva Convention III"), (entered into force Oct. 21, 1950);

---

[21] Committee on the Elimination of Racial Discrimination, Concluding observations on the combined seventh to ninth periodic reports of Azerbaijan, CERD C/AZE/CO/7-9 (June 10, 2016), available from undocs.org/CERD/C/AZE/CO/7-9, accessed October 15, 2020.

[22] United Nations Human Rights Committee, Concluding observations on the fourth periodic report of Azerbaijan, CCPR/C/AZE/CO/4 (November 16, 2016), available from undocs.org/en/CCPR/C/AZE/CO/4, accessed October 15, 2020.

D.      Geneva Convention relative to the Protection of Civilian Persons in Time of War, 75 U.N.T.S. 287 ("Geneva Convention IV"), (entered into force Oct. 21, 1950);

E.      Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), 1125 U.N.T.S. 609 (entered into force Dec. 7, 1978);

F.      The Charter of the International Military Tribunal, Nuremberg, of 8 August 1945, confirmed by G.A. Res. 3, U.N. Doc. A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236 (1946);

G.      The Rome Statute of the International Criminal Court, United States Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, U.N. Doc. A/CONF.183/9 (1998), reprinted in 37 I.L.M. 999 (1998);

H.      Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991, U.N. Doc. S/25704 at 36, annex (1993) and S/25704/Add.1 (1993), adopted by Security Council on 25 May 1993, U.N. Doc. S/RES/827 (1993);

I.      Statute of the International Tribunal for Rwanda, adopted by S.C. Res. 955, U.N. SCOR, 49th Sess., 3453d mtg. at 3, U.N. Doc. S/RES/955 (1994), 33 I.L.M. 1598, 1600 (1994).

*Universal Condemnation of Crimes Against Humanity*

82.     The international community has universally condemned crimes against humanity, thus incorporating this offense into the law of nations.

83.     The following international conventions and/or United Nations Security Council Resolutions support the premise that acts constituting crimes against humanity are incorporated into the law of nations:

A.      Universal Declaration on Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810, at 71 (1948);

B.      The Charter of the International Military Tribunal, Nuremberg, of 8 August 1945, confirmed by G.A. Res. 3, U.N. Doc. A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236 (1946);

C.      The Rome Statute of the International Criminal Court, United States Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, U.N. Doc. A/CONF.183/9 (1998), reprinted in 37 I.L.M. 999 (1998);

D.      The Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991, U.N. Doc. S/25704 at 36, annex (1993) and S/25704/Add.1 (1993), adopted by Security Council on 25 May 1993, U.N. Doc. S/RES/827 (1993);

E.      Statute of the International Tribunal for Rwanda, adopted by S.C. Res. 955, U.N. SCOR, 49th Sess., 3453d mtg. at 3, U.N. Doc. S/RES/955 (1994), 33 I.L.M. 1598, 1600 (1994);

G.      The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, adopted Nov. 26, 1968, 754 U.N.T.S. 73 (entered into force Nov. 11, 1970);

H.      Principles of International Co-Operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes Against Humanity, G.A. Res. 3074, U.N. GAOR 28th Sess., Supp. No. 30A at 78, U.N. Doc. A/9039/Add.1 (1973);

I.      Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452 (XXX), U.N. GAOR, 30th Sess., Supp. No. 34, at 91, U.N. Doc. A/10034 (x1975);

J.      American Convention on Human Rights, O.A.S. Treaty Series No. 36, 1144 U.N.T.S. 123, entered into force July 18, 1978, reprinted in Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser.L.V/II.82 doc.6 rev.1 at 25 (1992);

K.      American Declaration of the Rights and Duties of Man, O.A.S. Res. XXX, adopted by the Ninth International Conference of American States (1948),

reprinted in Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser.L.V/II.82 doc.6 rev.1 at 17 (1992).

L.     Council of Europe, *European Convention for the Protection of Human Rights and Fundamental Freedoms, as amended by Protocols Nos. 11 and 14*, 4 November 1950, ETS 5;

M.     African [Banjul] Charter on Human and Peoples' Rights, adopted June 27, 1981, OAU Doc. CAB/LEG/67/3 rev. 5, 21 I.L.M. 58 (1982), *entered into force* Oct. 21, 1986.

*Universal Condemnation of Genocide*

84.     The international community has universally condemned the crime of genocide, thus incorporating this offense into the law of nations.

85.     The following international conventions and/or United Nations Security Council Resolutions support the premise that the crime of genocide is incorporated into the law of nations:

A.     The Convention on the Prevention and Punishment of the Crime of Genocide ("Convention on Genocide"), 78 U.N.T.S. 277;

B.     The Statute of the International Criminal Tribunal for the Former Yugoslavia ("Statute of the ICTY"), Art. 4 (adopted by the U.N. Security Council in Resolution No.808 (May 3, 1993)), U.N. Doc. Sf25704;

C.     The Statute of the International Criminal Tribunal for Rwanda ("Statute of the ICTR"), Art. 2 (adopted by the U.N. Security Council in Resolution No. 955), U.N. Doc. S/INF/50 (1994); and

D.     The Rome Statute of the International Criminal Court, U.N. GAOR, 52d Sess., Annex II, at 4, U.N. Doc. A/CONF.183/9 (1998), Art. 6.

## COUNT ONE
## ALIEN TORT CLAIMS ACT CLAIM FOR AIDING & ABETTING
## WAR CRIMES IN VIOLATION OF THE GENEVA CONVENTIONS OF 1949
## AND THEIR ADDITIONAL PROTOCOLS

86.     Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

87.     Starting on or about September 27, 2020, Turkey and Azerbaijan engaged in a targeted attack on the civilian population of Artsakh using UAVs equipped with EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant.

88.     By means of these targeted attacks, Turkey and Azerbaijan murdered Arkady Lalayan (represented herein by his survivor and next-of-kin, Plaintiff Nver Lalayan) and seriously injured Plaintiffs Sergey Kostandyan and Elmira Torosyan in furtherance of their large-scale policy to destroy the Armenian population of Artsakh.

89.     The deliberate civilian shelling by Turkey and Azerbaijan using UAVs equipped with EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant, was perpetrated systematically upon Plaintiffs and Artsakh civilians.

90.     Turkey and Azerbaijan's targeted civilian shelling and drone attacks on the Artsakh civilian population were substantially assisted by Defendant's EO/IR Targeting Sensors used in Turkey and Azerbaijan's UAVs.

91.     The acts of torture and the acts of cruel, inhuman, or degrading treatment or punishment committed against Plaintiffs and the unarmed civilian population of Artsakh constitute war crimes.

92.     These acts were committed by Azerbaijan and Turkey during an armed conflict.

93.     The war crimes herein alleged are actionable because they were carried out in violation of the Geneva Conventions of 1949 and their Additional Protocols, which are treaties of the United States.

94.     Additionally, the war crimes alleged herein constitute a violation of the law of nations, as codified in relevant provisions of the international agreements and declarations listed in paragraph 83. Consequently, the war crimes alleged herein are actionable under the ATS.

95.     Defendant acted with knowledge and conscious disregard of Turkey and Azerbaijan's planning, preparation and execution of war crimes, providing organized and systematic targeting technology and other practical assistance which Turkey and Azerbaijan used to carry out attacks on civilians, civilian property and civilian infrastructure in Artsakh.

96.     At all times, Defendant acted with knowledge and conscious disregard, that its EO/IR Targeting Sensors would be used by, and substantially assist, Turkey and Azerbaijan to carry out attacks on civilians, civilian property, and civilian infrastructure in Artsakh.

97.     Defendant designed, engineered, manufactured, sold, and supported the EO/IR Targeting Sensors used by Turkey and Azerbaijan's intelligence-striking drones that allowed Turkey and Azerbaijan to specifically target residential areas and civilian populations; to hunt, target, and kill individual civilians; and to engage in war crimes.

98.     Defendant regularly developed, enhanced, engineered and improved the targeting technology allowing Turkey and Azerbaijan to use UAVs equipped with its O/IR Targeting Sensors to target civilian populations.

99.     Plaintiffs and their family members suffered death, severe injuries and/or property loss as a proximate result of Defendant's conduct, for which they now sue.

**COUNT TWO**
**ALIEN TORT CLAIMS ACT CLAIM**
**FOR AIDING & ABETTING CRIMES AGAINST HUMANITY**
**IN VIOLATION OF THE LAWS OF NATIONS**

100.    Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

101.    The deliberate shelling and drone attacks committed against Plaintiffs and the unarmed Artsakh civilian population constitute a crime against humanity in violation of the law of nations.

102.    Strong condemnation of crimes against humanity rests on a clear and definite norm of international law which is universally accepted by the civilized world. *See e.g.*, Charter of the International Military Tribunal, Aug. 8, 1945, art. 61, 59 Stat. 1546, 1547, E.A.S. NO. 472, 82 U.N.T.S. 284; Statute of the ICTY, Art. 5; Statute of the ICTR, Art. 3; *see also* The Rome Statute, Art. 7; ICCPR, Art. 20.

103.    Crimes against humanity are defined with a specificity comparable to international law violations that were familiar when the ATS was enacted. The core elements of a crime against humanity in violation of international law, as codified in the above sources and recognized in international law generally, are murder and other heinous acts against human life, physical welfare, and dignity that are undertaken as part of a widespread or systematic attack against a civilian population. These crimes are punishable whether committed in peacetime or in war.

104.    Starting on or about September 27, 2020, Turkey and Azerbaijan engaged in shelling of civilians, using UAVs equipped with EO/IR Targeting Sensors designed, engineered, manufactured, sold and supported by Defendant, as part of a systematic and widespread attack on a civilian population. By means of these attacks, Turkey and Azerbaijan murdered Arkadya Lalayan (represented herein by his survivor and next-of-kin, Plaintiff Nver Lalayan), and other

innocent Artsakh civilians, and seriously injured Plaintiffs Sergey Kostandyan and Elmira Torosyan, and other innocent Artsakh civilians, in furtherance of their overarching goal of destroying the Armenian population of Artsakh.

105.   The civilian shelling and murderous drone attacks committed by Turkey and Azerbaijan were perpetrated systematically. They required a high degree of planning, coordination, funding, and orchestration by Turkey and Azerbaijan. Sustained civilian shelling and murderous drone attacks involve the provision of UAVs; the understanding of the targeting technology and engineering; training on the targeting technology; the targeting of Plaintiffs and other members of the Artsakh civilian population, civilian property and civilian infrastructure; and payments to companies providing this technology and engineering.

106.   The sustained civilian shelling and murderous drone attacks committed by Turkey and Azerbaijan were widespread in nature. Plaintiffs and the entire Artsakh civilian population were targeted, injured and/or killed. The sustained civilian shelling and murderous drone attacks have taken place in public and private locations, during the day and night, and have involved attacks against men, women and children. Notably, the civilian shelling and murderous drone attacks in Artsakh have taken place in residential centers such as the capital Stepanakert and other cities including, but not limited to, Shushi, Hadrut, Vartenis, Martakert, and Martuni.

107.   The sustained civilian shelling and murderous drone attacks committed by Turkey and Azerbaijan constitute violations of the law of nations, as they are crimes against humanity.

108.   Defendant acted with knowledge and conscious disregard of Turkey and Azerbaijan's  crimes against humanity in violation of the law of nations.

109.   Defendant acted with knowledge and conscious disregard of Turkey and Azerbaijan's  planning, preparation and execution of war crimes, providing organized and

systematic targeting technology and other practical assistance to Turkey and Azerbaijan which Turkey and Azerbaijan used to carry out attacks on civilians, civilian property, and civilian infrastructure in Artsakh.

110. At all times, Defendant acted with knowledge and conscious disregard that its EO/IR Targeting Sensors would be used by, and substantially assist, Turkey and Azerbaijan to carry out attacks on civilians, civilian property, and civilian infrastructure in Artsakh.

111. Defendant designed, engineered, manufactured, sold, and supported the EO/IR Targeting Sensors used by Turkey and Azerbaijan's intelligence-striking drones that allowed Turkey and Azerbaijan to specifically target residential areas and civilian populations; to hunt, target, and kill individual civilians; and to engage in crimes against humanity.

112. Defendant regularly developed, enhanced, engineered and improved the targeting technology allowing Turkey and Azerbaijan to use such UAVs for targeting civilian populations.

113. Plaintiffs and their family members suffered death, severe injuries and/or property loss as a proximate result of Defendant's conduct, for which they now sue.

**COUNT THREE**
**ALIEN TORT CLAIMS ACT CLAIM FOR**
**AIDING & ABETTING AND COMPLICITY IN ACTS**
**OF GENOCIDE IN VIOLATION OF THE LAW OF NATIONS**

114. Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

115. Genocide has been universally recognized as a violation of a clear and definite norm of international that is universally accepted by the civilized world. Genocide is so widely condemned that it has achieved the status of a *jus cogens* violation, and, therefore, is a violation

of the law of nations such that the commission of genocide by a party subjects it to liability to aliens in United States courts under the ATS.

116.    The Convention on the Prevention and Punishment of the Crime of Genocide ("Convention on Genocide"), 78 U.N.T.S. 277, adopted in 1948 and ratified by more than 136 nations, defines "genocide" as: "[a]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial, or religious group, as such: (a) killing members of the group; (b) causing serious bodily injury or mental harm to members of the group; (c) deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part." The Convention goes on to note that "persons committing genocide shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals."

117.    The most recent examples of the re-adoption of the Convention on Genocide's standard definition of genocide by the international community, including the United States, are the statutes concerning the International Criminal Tribunal of the Former Yugoslavia ("ICTY") and the International Criminal Tribunal for Rwanda ("ICTR"). *See* Statute of the International Criminal Tribunal for the Former Yugoslavia ("Statute of the ICTY"), Art. 4 (adopted by the U.N. Security Council in Resolution No. 808 (May 3, 1993)), U.N. Doc. S/25704; Statute of the International Criminal Tribunal for Rwanda ("Statute of the ICTR"), Art. 2 (adopted by the U.N. Security Council in Resolution No. 955), U.N. Doc. S/INF/50 (1994). The definition contained within the Statute of the ICTY and the Statute of the ICTR expand upon that articulated by the Convention on Genocide by criminalizing conduct that "[i]mpos[es] measures intended to prevent births within the group."

118.    The international community also adopted this expanded definition of genocide in the Rome Statute of the International Criminal Court ("The Rome Statute"). *See* the Rome Statute,

U.N. GAOR, 52d Sess., Annex II, at 4, U.N. Doc. A/CONF.183/9 (1998), Art. 6. The Rome Statute has not been ratified by the United States for reasons unrelated to the definition of genocide; however, its adoption of definitions universally accepted within the international community through the Statute of the ICTY and the Statute of the ICTR shows how this definition of genocide has become part of the law of nations.

119.     The international community has also recognized the crime of genocide through the International Covenant on Civil and Political Rights ("ICCPR"), adopted for signature, ratification and accession by General Assembly resolution 2200A (XXI) of December 16, 1966, and entered into force in accordance with Article 49 on March 23, 1976. The ICCPR, to which the United States is a party (together with most civilized nations), specifically states in Article 6 that "[n]o one shall be arbitrarily deprived of his life." Article 20 further states that "[a]ny advocacy of national, racial, or religious hatred that constitutes incitement to discrimination, hostility or violence shall be prohibited by law."

120.     Furthermore, on November 4, 1988, the Genocide Convention Implementation Act of 1987 (the Proxmire Act), Pub. L. 100-606, was signed into law by President Ronald Reagan. As stated in the text of Senate Resolution 307 (107th Congress, 2nd Session), by this action, the United States Code (18 U.S.C. § 1091) was amended "to criminalize genocide under the United States law." Senate Resolution 307 further called upon "the people and Government of the United States to rededicate themselves to the cause of bringing an end to the crime of genocide (as postulated under international law and with passage of this act under US law)."

121.     Genocide is defined with a specificity that is sufficiently comparable to international law violations that were familiar when the ATS was enacted. Genocide is therefore a violation of the law of nations actionable under the ATS for private actors. *Kadic v. Karadzic*, 70

F.3d 232 (2d Cir. 1995) (cited approvingly in *Sosa v. Alvarez-Machain*, 124 S.Ct. 2739, 2766 n.20 (2004)).

122.    The  drone attacks carried out by Turkey and Azerbaijan, with the assistance of Defendant's EO/IR Targeting Sensors, against Armenians is a genocidal campaign.

123.    As part of this campaign, Turkey and Azerbaijan have killed and caused serious bodily injury and mental harm to civilians in Artsakh, using UAVs equipped with Defendant's EO/IR Targeting Sensors, with the intent to destroy Armenians of Artsakh. These acts fit squarely within the well-settled international law definition of genocide as set forth in the Genocide Convention.

124.    Article 3 of the Convention on Genocide notes that among the acts which are punishable are "(a) Genocide; (b) Conspiracy to commit genocide; (c) Direct and public incitement to commit genocide; (d) Attempt to commit genocide; and (e) Complicity in Genocide."

125.    The concept of complicit liability for conspiracy, or aiding and abetting, is well developed in international law. Under international law, one is responsible for a crime which is committed when that party provides "knowing practical assistance or encouragement which has a substantial effect on the perpetration of the crime."

126.    Under the Allied Control Council Law No. 10 (Dec. 20, 1945), criminal liability extends not only to principals who committed acts of genocide or war crimes but also to those who were connected with any plans or enterprises involving the commission of such crimes. Cases emanating from the ICTY and the ICTR also confirm that aiding and abetting genocide and/or war crimes is actionable.

127.    Defendant designed, engineered, manufactured, sold, and supported the EO/IR Targeting Sensors used by Turkey and Azerbaijan's intelligence-striking drones that allowed

Turkey and Azerbaijan to specifically target residential areas and civilian populations; to hunt, target, and kill individual civilians; and to engage in genocide.

128.    Defendant regularly developed, enhanced, engineered and improved the targeting technology allowing Turkey and Azerbaijan to use UAVs equipped with its EO/IR Targeting Sensors to target civilian populations.

129.    At all times, Defendant acted with knowledge, and conscious disregard, that its EO/IR Targeting Sensors would be used by, and substantially assist, Turkey and Azerbaijan to carry out attacks on civilians, civilian property, and civilian infrastructure in Artsakh.

130.    Defendant aided and abetted, and consciously disregarded, Turkey and Azerbaijan's planning, preparation and/or execution of genocide. Defendant did so by providing organized and systematic targeting technologies, sophisticated engineering and other practical assistance to Turkey and Azerbaijan, all of which had a substantial effect on the perpetration of genocide.

131.    Plaintiffs and their family members suffered death, severe injuries and/or property loss as a proximate result of Defendant's conduct, for which they now sue.

## COUNT FOUR
### AIDING & ABETTING ACTS OF  EXTRAJUDICIAL KILLING AND TORTURE IN VIOLATION OF THE TORTURE VICTIM PROTECTION ACT

132.    Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

133.    The acts of extrajudicial killing and torture and the acts of cruel, inhuman, or degrading treatment or punishment committed against Plaintiffs and the unarmed Artsakh civilian population alleged herein constitute violations of the Torture Victim Protection Act.

134.   Turkey and Azerbaijan carried out acts of extrajudicial killings and torture of Plaintiffs in Artsakh with UAVs equipped with EO/IR Targeting Sensors designed, engineered, manufactured, sold, and supported by Defendant.

135.   At all times, Defendant acted with knowledge, and conscious disregard, that the EO/IR Targeting Sensors would be used by, and substantially assist, Turkey and Azerbaijan to carry out attacks on civilians, civilian property, and civilian infrastructure  in Artsakh.

136.   Defendant aided and abetted the intentional infliction, or threatened infliction, of severe physical and mental pain and suffering on Plaintiffs by Turkey and Azerbaijan.

137.   Defendant designed, engineered, manufactured, sold, and supported the EO/IR Targeting Sensors allowing Turkey and Azerbaijan to target residential areas and to hunt and kill individual civilians.

138.   Defendant regularly developed, enhanced, engineered and improved the EO/IR Targeting Sensors allowing Turkey and Azerbaijan to use UAVs equipped with such EO/IR Targeting  Sensors to target civilian populations and to hunt and kill individual civilians.

139.   Defendant aided and abetted the deliberate killing of Arkady Lalayan, (represented herein by his survivor and next-of-kin, Plaintiff Nver Lalayan) that was inflicted by Turkey and Azerbaijan and not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

140.   Defendant's actions, as described above, resulted in Plaintiffs being placed under the threat of imminent harm and resulted in physical and mental pain and suffering, and even death.

141.   Plaintiffs and their family members suffered death, severe injuries and/or property loss  as a proximate result of Defendant's conduct, for which they now sue.

## PRAYER FOR RELIEF
## COUNTS ONE, TWO, THREE, AND FOUR

142.    Wherefore, Plaintiffs respectfully request this Honorable Court to find:

   A.    That the Defendant aided and abetted Turkey and Azerbaijan's war crimes in violation of the Geneva Conventions of 1949 and their Additional Protocols.

   B.    That the Defendant aided and abetted Turkey and Azerbaijan's crimes against humanity in violation of the Law of Nations.

   C.    That the Defendant aided and abetted Turkey and Azerbaijan's acts of genocide in violation of the Law of Nations.

   D.    That the Defendant aided and abetted Turkey and Azerbaijan's acts of extrajudicial killing and torture in violation of the Torture Victim Protection Act.

   E.    That the Court award Plaintiffs restitution, compensatory damages, and punitive damages in amounts to be proved at trial or thereafter.

   F.    That the Court award Plaintiffs any other relief, including attorneys' fees and costs, that the Court finds appropriate, just, and equitable.

Plaintiffs demand a trial by jury as to all claims so triable.

Date:  October 16, 2020                    Respectfully Submitted,


                    By: /s/ *Karnig S. Kerkonian*
                    Karnig S. Kerkonian (D.D.C. Bar No. IL0040)
                    Elizabeth M. Al-Dajani (D.D.C. Bar No. IL0039)
                    Gayane Khechoomian (D.D.C. Bar No. CA00029)
                    KERKONIAN DAJANI LLC
                    1555 Sherman Avenue, Suite 344
                    Evanston, Illinois 60201
                    Tel. (312) 416-6180 Fax (312) 604-7815
                    kkerkonian@kerkoniandajani.com
                    ealdajani@kerkoniandajani.com
                    gkhechoomian@kerkoniandajani.com

                    *Attorneys for Plaintiffs*